**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————

**JANE DOE,**

                        **Plaintiff,**

       **-against-**

**THE CITY OF NEW YORK, JOSE COSME,**
**and LEONARD McNEIL (individually and**
**in his official capacity),**

                     **Defendants.**

———————————————————

**COMPLAINT**

**CIVIL ACTION NO.:** 1:18-cv-07889

**<u>Jury Trial Demanded</u>**

Plaintiff Jane Doe, by her undersigned counsel, brings this action seeking relief and challenging the acts and omissions of the City of New York ("the City"), former City of New York Department of Correction Officer Jose Cosme ("Cosme"), and City of New York Department of Correction Officer Leonard McNeil ("McNeil") (collectively, "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1.      Defendants violated Jane Doe's constitutional rights to be protected from rape, sexual abuse, sexual harassment, and retaliation.

2.      On or about November 30, 2015, while on duty, Cosme ordered Jane Doe to leave her work assignment and clean his office, located in an isolated area.  After trapping her in his office, Cosme threatened, raped, sexually abused, and sexually harassed Jane Doe.

3.      Jane Doe reported to New York City Department of Correction ("DOC") officials that Cosme had raped, sexually abused, and sexually harassed her when she was a detainee at Rikers Island ("Rikers"), and she turned over incriminating evidence against Cosme.  Cosme has since pled guilty to a felony charge of sexually abusing Jane Doe.

4.      Jane Doe also reported that McNeil had raped, sexually abused, and sexually harassed her when she was a detainee at Rikers.  Upon information and belief, McNeil remains employed as a Correction Officer ("CO").

5.      The City's customs, policies, practices, acts, and omissions allowed Cosme and McNeil to rape, sexually abuse, and sexually harass Jane Doe.

6.      The City's customs, policies, practices, acts, and omissions allowed Cosme, McNeil, and other staff members to retaliate against Jane Doe because she reported the rape, sexual abuse, and sexual harassment.

7.      The City has long been on notice that there is a significant risk that DOC staff sexually exploit women in its custody.  The City, nevertheless, permits a culture of systemic rape, sexual abuse, and sexual harassment of women by staff to exist at the Rose M. Singer Center ("RMSC"), the women's jail at Rikers.

8.      Despite being on notice of the widespread rape, sexual abuse, and sexual harassment perpetrated by COs and other staff at RMSC, the City acted with deliberate indifference to the substantial risk of harm to Plaintiff and other women in its custody.

9.      The City claims to recognize that Rikers is a "dehumanizing environment," from which inmates are released "more broken than when they came in," but, to date, neither policies and practices promulgated by the City nor the City's approach to the women who brave retaliation from COs and other staff to complain of rape and other sexual abuse demonstrate any effort to change the status quo.

10.     Since Jane Doe reported Cosme and McNeil for raping, sexually abusing, and sexually harassing her, the City has failed to protect Jane Doe from threats, intimidation, and retaliation from correctional staff.  Jane Doe continues to suffer this abuse.

11.      Jane Doe brings this civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Cosme, McNeil, and the City to obtain a declaratory judgment and compensatory and punitive damages for deprivation of her constitutional rights.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

13.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b).

## THE PARTIES

14.     Plaintiff Jane Doe was held in pretrial detention at RMSC from July 2015 to February 2016.

15.     At all times relevant to this Complaint, Cosme was a CO employed by DOC and the City, and assigned to work at RMSC.  Jane Doe sues Cosme in his individual and official capacities.  Upon information and belief, Cosme is a resident of the State of New York.

16.     At all times relevant to this Complaint, McNeil was a CO employed by DOC and the City, and assigned to work at RMSC.  Upon information and belief, McNeil continues to be employed by DOC and the City as a CO.  Jane Doe sues McNeil in his individual and official capacities.  Upon information and belief, McNeil is a resident of the State of New York.

17.     Defendant the City is a municipal entity created and authorized under the laws of the State of New York.  The City is authorized by law to maintain a correction department that is its agent in the corrections area and for which it is responsible.  The City maintains DOC, a municipal entity created and authorized under the laws of the State of New York.  DOC is authorized by law to carry out all correction functions for the City, and has responsibility for the care, custody, and control of persons held by the City in correctional facilities.

## STATEMENT OF FACTS

### I.   COSME AND MCNEIL ACTED IN CONCERT TO EACH RAPE, SEXUALLY ABUSE, AND SEXUALLY HARASS JANE DOE

18.     New York State has criminalized all sexual activity or sexual contact between incarcerated individuals and correctional staff.  *See* N.Y. Penal Law §§ 130.05(3)(f), 130.25(1) and 130.40(1). These penal statutes recognize the inherently coercive power that correctional officers wield over incarcerated women by eliminating a correction officer's defense of "consent" to a criminal charge of rape or sexual abuse of an inmate.  Upon information and belief, at all times, Cosme and McNeil were aware that Jane Doe, as a detainee in City custody, was unable to consent to sexual activity.

19.     McNeil targeted Jane Doe and arranged to have undisturbed access to her so he could rape, sexually abuse, and sexually harass her.

20.     Shortly after Jane Doe arrived at RMSC, she began working for McNeil's co-worker, CO Tabor.  McNeil, who could pick any worker, told Tabor that he wanted Jane Doe to work for him as a sanitation worker.  Upon information and belief, McNeil did not submit any work requests to have Jane Doe work for him, as required by DOC policy.

21.     When Tabor realized that McNeil was taking Jane Doe to his work station to sexually abuse her, Tabor stopped asking Jane Doe to work for him.

22.     About three weeks after Jane Doe began working for McNeil, McNeil stopped choosing other detainees to work for him and told Jane Doe it was so that they could be alone.

23.     CO Bush, another of McNeil's co-workers on the midnight sanitation shift, knew that McNeil was taking Jane Doe to be alone with her in his station and that McNeil was not filing the necessary paperwork.

24.     McNeil typically waited to see Jane Doe until after the second garbage pick-up so everyone else would be gone and he could be alone with Jane Doe in his office.

25.     In or about September 2015, when Jane Doe was working at the loading dock, McNeil told Jane Doe to stop working for CO Bush because McNeil was jealous of her working for anyone else.  She refused to do so and McNeil became angry.  McNeil then grabbed her and kissed her.

26.     In or about September 2015, when they were alone in his office, McNeil—for the first time of many—rubbed Jane Doe's vagina and breasts and inserted his finger in her vagina.

27.     McNeil's office was located across from the RMSC Captains' office.

28.     In or about October 2015, as McNeil and Jane Doe were in his office and he was on the telephone with his child's mother, McNeil pulled Jane Doe to his groin area and gestured for her to perform oral sex on him.  That was the first of approximately six times that she performed oral sex on him, usually in McNeil's office and once at the loading dock.

29.     Once, when McNeil and Jane Doe were having vaginal intercourse in his office, Tabor walked in and saw them.  Tabor did not report what he saw.

30.     Jane Doe went to the health clinic after she had had vaginal intercourse with McNeil and asked for an Abbott pregnancy test (to be given within ten days of sexual intercourse).  The clinic refused to give her an Abbott test, but instead performed another pregnancy test, because she had been in jail for two months and they saw no need for the ten-day test.

31.     Jane Doe discussed with McNeil that she might be pregnant and he said he would "take care of his seed."  He showed her pictures of his ex-girlfriends and their children.

32.     On numerous occasions McNeil gave Jane Doe contraband, including makeup and food and beverages from outside the jail, such as Kentucky Fried Chicken, Starbucks coffee, and candy.

33.     McNeil picked out used clothing that detainees and inmates had left behind at the jail and gave them to Jane Doe, telling her, "I want to see you in them."

34.     McNeil also allowed Jane Doe access to his cell phone and, at his request, Jane Doe taught McNeil how to play Sudoku on his cell phone.

35.     Once, McNeil was on the telephone with his mother when he told his mother to speak with his friend.  He handed the phone to Jane Doe, who chatted with McNeil's mother. McNeil's mother asked Jane Doe:  "What are you doing there?  I hear you're a nice girl."

36.     McNeil also let Jane Doe use his cell phone to call a friend.

37.     McNeil told Jane Doe that when she was released he wanted her to dye her hair blonde, wear blue contact lenses, and visit him at the club where he worked as a bouncer.

38.     McNeil took commissary items from Jane Doe, including snacks such as Skinny Cow chocolate.

39.     The attention that McNeil paid to Jane Doe did not go unnoticed.  McNeil would visit Jane Doe in her housing area, just to see her.

40.     Once, when McNeil, Jane Doe, and two other detainees were watching a football game on TV in McNeil's office, McNeil grabbed Jane Doe and kissed her in front of the other detainees.

41.     Upon information and belief, McNeil continues to be employed by DOC at Rikers.

42.     Upon information and belief, by November 2015, Cosme had become aware that McNeil was regularly sexually abusing and sexually harassing Jane Doe.

43.     On several occasions, Cosme made sexual advances to Jane Doe and directed vulgar comments to her.  In the presence of McNeil, for example, Cosme took out cash from his wallet and offered it to Jane Doe for a "lap dance."

44.     In or about late November 2015 (about a week before Cosme raped Jane Doe), Cosme passed Jane Doe a note in which he threatened to reveal to his superiors that McNeil was having sexual intercourse with Jane Doe so that McNeil would lose his job, and Cosme could replace him.

45.     Upon receiving the threat, Jane Doe became nervous and destroyed the note. When she told McNeil what it said, he became so angry that he flipped over a cart.

46.     Upon information and belief, McNeil facilitated Cosme's rape, sexual abuse, and sexual harassment of Jane Doe so that Cosme would not file a report revealing McNeil's sexual misconduct.

47.     On or about November 30, 2015, in the evening, Cosme was at his post in the COs' station, an enclosed office known as the "bubble," where he was assigned to modified duty. Upon information and belief, he was assigned to such duty because of misconduct in the adolescent facility at Rikers. The area where Cosme was stationed was well-known at RMSC as an isolated part of the annex, which was a condemned area at RMSC.  Around that area, Jane Doe was performing sanitation duties, one of her three jobs at RMSC, in an isolated area closed off from RMSC, under McNeil's supervision.

48.     Around 9:00 p.m., as Jane Doe was finishing up her task, McNeil left his assigned station and walked down the hallway and around the corner, purportedly to make a personal

telephone call. Although on other occasions McNeil had made personal telephone calls in Jane Doe's presence, including while she was performing oral sex on him, on this occasion McNeil left Jane Doe alone in the hall.

49. Cosme, upon seeing Jane Doe alone, went to the hallway outside the bubble and called out for her to come over, purportedly to clean his office.

50. At the time, there was a camera by the bubble, but, upon information and belief, because that part of the building was closed off, the camera was not connected to the monitors at the control room and the camera did not record or save footage. Upon information and belief, it was common knowledge among staff and detainees that this camera was not in operation.

51. Jane Doe grabbed her cleaning supplies and complied with Cosme's order. Once she arrived near the bubble, however, Cosme locked a gate to the hallway, trapping her inside with him. Jane Doe was afraid, but remained hopeful that he really did just want her to clean the office, so she went inside the office.

52. As Jane Doe, who at that time weighed only about 100 pounds, entered Cosme's office—which was about the size of a storage closet and surrounded by Plexiglas—Cosme, a man who is at least six feet tall and at the time weighed over 310 pounds, blocked her way out and locked the door shut.

53. Cosme threatened Jane Doe with violence. Trying to intimidate Jane Doe, he bit off a callus on his finger and said to her: "If I can do this to myself, imagine what I'll do to you."

54. Jane Doe's heart beat fast and she froze in fear.

55.     Jane Doe screamed, "No, stop!" and put her hands in front of her body.  Even though she begged Cosme to stop and repeatedly whimpered, "No," he ripped open her institutional jumpsuit and ordered her to strip off her pants and underwear.

56.     Jane Doe went into shock as she realized that Cosme was about to rape her.  Her body shook as Cosme turned her around to face the Plexiglas wall.  Jane Doe cried.

57.     Jane Doe did not fight back because she was afraid that if she did Cosme would accuse her of assaulting an officer and put her in solitary confinement.  She also realized that fighting back would likely be futile given that Cosme was much taller and three times her weight.

58.     After Jane Doe had obeyed, Cosme slammed her face and body into the Plexiglas.  Smothering her with his body weight, Cosme jabbed his then erect penis about five times at Jane Doe's vagina, but could not fully penetrate her because her vagina was dry.  Jane Doe yelled that he was hurting her and begged Cosme to stop, as she banged loudly on the Plexiglas.

59.     Instead of stopping, Cosme licked his palm, rubbed saliva on his penis, and jabbed Jane Doe's vagina again as she continued to scream and bang on the Plexiglas.

60.      Cosme then pulled Jane Doe and bent her over a table and, slamming into her, forced his erect penis in her dry vagina from behind, causing her excruciating pain.

61.     Cosme covered Jane Doe's body with his and smothered her.   Jane Doe repeatedly screamed:  "It hurts, it hurts," and "You're hurting me, you're hurting me!"

62.     As Cosme was raping Jane Doe, she felt as if something had burst inside of her and then a lot of liquid came out of her vagina.  Jane Doe begged Cosme not to ejaculate inside of her.

63.    Cosme then sat down and slammed Jane Doe on top of him with his erect penis still inside her vagina.  Jane Doe begged and cried out for him to stop and not to ejaculate inside of her.

64.    As he was raping Jane Doe, Cosme's phone rang and he answered it.  Cosme conversed with someone for about forty seconds, while his erect penis was still inside Jane Doe.  While on the phone, Cosme sat back onto a chair and forcefully gripped Jane Doe's right hip to keep her in place.

65.    The call ended, and Cosme continued penetrating Jane Doe as she again begged him not to ejaculate inside of her.  Cosme slammed a sobbing Jane Doe up and down on top of him.

66.    Cosme then abruptly stood up and Jane Doe fell to her knees.  She was sobbing and shaking and her chest began to feel tight.

67.    Cosme pulled Jane Doe's hair, ripping out a section of her hair.

68.    Cosme forced Jane Doe's face to his penis.  Cosme continued to pull Jane Doe's hair with one hand while he masturbated with the other.

69.    During this time, Cosme's phone rang again (about five to seven minutes after the first call), but he ignored it.

70.    Cosme ordered Jane Doe to lift up her shirt and expose her bare breasts to him.

71.    Jane Doe complied, and, as he masturbated, Cosme said:  "Tell me you had that black dick!  Tell me you had that black dick!  Tell me you had that black dick!"

72.    Cosme ejaculated onto Jane Doe's breasts.

73.    Immediately after, Cosme wiped himself with paper towels and told Jane Doe to get dressed.

74.     Jane Doe remained in shock, still kneeling on the floor, but got up to comply with Cosme's order.  Her uniform lay crumpled up in the corner.

75.     Jane Doe was in pain all over her body, including her vagina, and her head hurt from where Cosme had pulled out her hair.

76.     Cosme then escorted Jane Doe back to her housing area in Building 14.  Cosme walked ahead, while Jane Doe followed a few steps behind.  Jane Doe could hardly breathe.  As they were walking, Cosme laughed and said to Jane Doe:  "At least my wife can have a break tonight."

77.     Sometime past 9:30 p.m., Jane Doe and Cosme arrived at Building 14.  McNeil was there and asked Jane Doe if she was okay.

78.     The CO assigned to Building 14 that night, Springer, stated that she had just asked McNeil where Jane Doe was because Jane Doe had missed the mandatory 9 p.m. cell lock-in.

79.     When she was back in her cell, Jane Doe used a white T-shirt to wipe off Cosme's ejaculate from the gray T-shirt she was wearing when Cosme raped her.

80.     As she sat in her cell, Jane Doe began having trouble breathing and her chest felt tight, so she told a CO in her housing area how she felt and was escorted to the RMSC medical clinic.

81.     When she arrived, Jane Doe told a nurse:  "He hurt me.  I can't breathe," but the nurse and other staff members did not ask what had happened and were rude and curt.

82.     Without actually examining her, the physician told the nurse:  "She's having a panic attack.  Put ice on her."

83.     No one at the clinic examined Jane Doe and, after she had been in the clinic a mere ten minutes, the medical staff discharged her.

-12-

84.     Jane Doe returned to her cell, where she ripped into pieces the white T-shirt which she had used to clean the ejaculate off the gray T-shirt that she had been wearing during the rape.

85.     Later that night, from an office where she worked on the midnight shift, Jane Doe mailed one piece of the semen-soaked white T-shirt to her sister and another to a family friend.

86.     Upon information and belief, this evidence, along with Jane Doe's underwear and bra from the day of Cosme's rape, was turned over to the Bronx District Attorney's office. The ejaculate on the T-shirt would test positive for Cosme's DNA.

87.     After mailing the DNA evidence and finishing her shift around 2:00 a.m., Jane Doe returned to her cell, but was unable to sleep the rest of that night because she was traumatized. Jane Doe was in physical pain throughout her body and head and she had bruises on her legs and thighs.

88.     Soon after, Jane Doe reported Cosme's rape to McNeil and showed him the bruises which Cosme had caused when he raped and abused her.

89.     McNeil ordered Jane Doe not to report Cosme's rape until after McNeil had gone on vacation.

90.     Jane Doe obeyed McNeil; she did not report that Cosme had raped her until mid-December 2015, after McNeil had gone on vacation.

91.     Later, when a family friend (the same one to whom she had mailed a piece of the white T-shirt) visited her at the jail, Jane Doe gave him the gray T-shirt she had been wearing when Cosme raped her.

92.     Jane Doe saved Cosme's DNA evidence and mailed it out because of a prior sexual abuse complaint she had made against a CO. Jane Doe believed that DOC had not taken

the prior sexual abuse seriously because she was never informed as to whether there was any investigation or of the outcome of her complaint. Jane Doe therefore believed that DOC would not believe her report that Cosme raped her if she did not have physical evidence.

93.     In the prior sexual abuse complaint, Jane Doe had reported to DOC that CO Nicholas Terrano ("Terrano") was giving cigarettes to multiple women at RMSC, including herself, if they performed oral sex on him.

94.     In or about 2011, Jane Doe performed oral sex on Terrano about five times. After she had performed oral sex on Terrano, he usually threw three or four cigarettes at her.

95.     Investigators from the Inspector General's office interviewed Jane Doe after she had made the complaint against Terrano, but no one contacted her after that initial interview.

96.     Jane Doe also knew that simply giving physical evidence directly to DOC staff was not enough because she had witnessed how COs had mistreated another detainee at RMSC, Jennifer Roe.

97.     In that situation, Jennifer Roe had accused a male CO of raping her. Jennifer Roe tried to file a complaint and gave DOC staff her underwear, which contained evidence of the rape. Upon information and belief, the DOC staff member took and then discarded the underwear. Upon information and belief, DOC never did anything about Jennifer Roe's complaint that she had been brutally abused and raped.

98.     A few days after Cosme had raped and sexually abused Jane Doe, Cosme handed her contraband, a plastic bag with about twenty Newport cigarettes. Jane Doe gave most of the cigarettes to other female detainees and she smoked one while McNeil watched.

99.     On or around December 16, 2015, when McNeil was on vacation, two weeks after Cosme had raped Jane Doe, Jane Doe reported Cosme's rape to CO McDaniel (a female CO) for

whom Jane Doe worked.  CO McDaniel called Captain White and two other supervisors, who then contacted the Inspector General's office.

100.     Investigators Captain Taylor and Corsica arrived and interviewed Jane Doe.

101.     Taylor and Corsica videotaped Jane Doe at the crime scene where Cosme had raped and sexually abused her.  Jane Doe demonstrated to them how Cosme had pushed her face and body against the Plexiglas in the office, as she had screamed for him to let her go.

102.     Jane Doe told Taylor and Corsica about the DNA samples which she had given to her sister and family friend.

103.     Afterwards, Jane Doe was taken to the medical clinic where her blood was drawn. The doctor did not perform a rape kit because of the length of time that had passed since Cosme had raped her.

104.     DOC's response to Jane Doe's report was to offer protective custody, which she declined because she had claustrophobia and she did not want to be isolated and locked in a cell for the majority of the day.

105.     Jane Doe spoke with a clinician from the Office of Mental Health and told her that Cosme had raped her.  The clinician, however, questioned Jane Doe about whether she had "imagined" it.

106.     Jane Doe also told M. G., another inmate who was a friend of hers, that Cosme had raped her.

107.     Because of Jane Doe's reporting and preservation of DNA evidence, the District Attorney of Bronx County prosecuted Cosme.  Cosme pled guilty to a Criminal Sex Act in the Third Degree, a class E felony, which carried a ten-year probationary sentence and required Cosme to register as a sex offender.

108.     After the rape, Jane Doe was the victim of harassment, hateful comments, and other retaliation by Cosme, McNeil, other correctional staff, and inmates at RMSC, Bedford Hills Correctional Facility, and Albion Correctional Facility.

109.     At RMSC, the CO in charge of assignments fired Jane Doe from her three work assignments, one of which paid her $15 a week.  Jane Doe was not told why she was being fired or whether there was any cause for her termination.

110.     Only later did Jane Doe find out that there was a sign in the bubble, where COs were stationed, that said not to take Jane Doe out of her cell.  This included not taking her out to perform her jobs, to church, group programs, mental health counseling or any other places.

111.     Jane Doe told Captain Taylor that DOC had fired her from all three work assignments and that she wished she could still work, because it was a way to keep herself busy and not to have to think about Cosme's rape all the time.  A little while later, Jane Doe was told that she could resume her job for CO McDaniel (the female CO to whom Jane Doe had first reported her rape), but she was never able to resume the other two jobs.

112.     Other forms of retaliation continued, including that COs at RMSC refused to escort Jane Doe to religious services.  When church services were called, Jane Doe would get in the line to attend church.  The COs ordered Jane Doe to get out of line.  When she asked why, they either ignored her or made comments like "You run your mouth too much," or "Shit runs downhill."

113.     In another form of retaliation, on at least one occasion, the COs at RMSC refused to escort Jane Doe to the medical clinic.

114.     In a further form of retaliation, the COs at RMSC refused to give Jane Doe basic toiletries, including soap.

115.    In a further form of retaliation, the COs at RMSC refused to escort Jane Doe back from court appearances outside the facility.  On several occasions, COs left Jane Doe in the bullpens at court because everyone refused to escort her.  On some occasions COs took other women from her unit back to RMSC from the courthouse and left her behind.

116.    The retaliation included verbal harassment from DOC staff.  One day, Jane Doe was standing in line to obtain her medication when McNeil pointed at her as he said to another CO: "What you do with someone like her is two to the chest, one to the head, I can shoot." The other CO replied: "Maybe two to the head and one to the chest." McNeil and the other CO laughed.

117.    On another day, McNeil told Jane Doe that she was a "fucking snitch," "a hoe," and a "bitch."

118.    A female CO at RMSC threatened Jane Doe, telling her that she had her home address and that Jane Doe could be "touched anywhere."

119.    A female CO at RMSC said about Jane Doe:  "What do you expect from a cracker?" as Jane Doe walked past on her way to work.  Jane Doe asked a second female CO why the other CO had called her a "cracker."  The second CO replied:  "Because you're a weak bitch and you're gonna crumble."

120.    Deputy Warden Johnson, a facility supervisor, said to another CO in Jane Doe's presence:  "She's just out for a pay day!"

121.    The retaliation continued once Jane Doe was transferred to Bedford Hills prison.  There, someone put a large piece of onion in her pocket and then a CO said:  "That bitch stinks."

122.    A CO at Bedford Hills prison also referred to Jane Doe as a "White bitch."

123.     As a result of this harassment, Jane Doe isolated herself as much as possible in an effort to avoid such verbal abuse and harassment.

## II.     THE CITY IS DELIBERATELY INDIFFERENT TO THE RAPE, SEXUAL ABUSE, AND SEXUAL HARASSMENT BY CORRECTIONAL STAFF OF WOMEN IN DOC'S CUSTODY

124.     The City, through DOC, is responsible for the care, custody, and control of detainees and City-sentenced inmates.  Through its acts and omissions, the City has facilitated the rape, sexual abuse, and sexual harassment of the women committed to its custody and demonstrated a deliberate indifference to the safety of these women.

125.     The City operates eight jail facilities on Rikers, holding an average of approximately 9,500 individuals on a daily basis.  RMSC, where Jane Doe was held when Cosme and McNeil raped, sexually abused, and sexually harassed her, is the women's jail at Rikers, holding on average 800 women at any given time.

126.     The City's practices show a callous disregard for legal requirements and correctional professionalism.

127.     New York State has recognized the coercive power that COs wield over incarcerated women, and the related risk of rape and other sexual abuse, by criminalizing all sexual activity between incarcerated individuals and correctional staff in New York Penal Law § 130.05(3)(f), New York Penal Law § 130.25(1), and New York Penal Law § 130.40(1).

128.     Recently, in a report issued in March 2018, comparing allegations of sexual abuse and sexual harassment for the calendar years 2016 and 2017, DOC stated that there were 374 staff sexual misconduct allegations reported in 2017 and 322 in 2016 (including a "wide-range of

behaviors" such as sexual acts, touching for sexual gratification, voyeurism and indecent exposure).[1]

129.    According to a WNYC article from May 2016, medical staff at Rikers reported 118 incidents of alleged sexual abuse or harassment against inmates from January to May 2016—a number of reports one doctor described as "alarming."[2]   The article further cites health officials' statements that out of fifty-six sexual abuse reports made in the first quarter of the year, forty of the incidents involved reports of COs abusing inmates.

130.    Additional examples include, but are not limited to the following:

- In 2010, *The Village Voice* reported that an inmate at RMSC became pregnant after she was raped by a CO.  The article reported that when the pregnancy was discovered, five COs were transferred to other facilities.[3]

- In May 2015, two women filed a putative class action lawsuit alleging that seven COs at RMSC had repeatedly raped and sexually abused inmates.[4]  The inmates further alleged that one CO, Officer Santiago, punished a woman by anally raping her for resisting his abuses and that he threatened another woman that he would "charge her with false disciplinary infractions and [ ] cause other inmates to attack her" if she reported him.[5]  In addition, the inmates contended that other COs had knowledge of the abuse but allowed it to continue and even facilitated in protecting Officer Santiago by threatening the two inmates and retaliating against them by, among other things, locking the women in their cells and "deny[ing]

---

[1] Dept. of Correction Reports, NYC Board of Correction https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/DOC-Reports/2018.03.15%20-%20Annual%20Sexual%20Abuse%20and%20Sexual%20Harassment%20Assessment%20Report%20(PREA).pdf (last accessed August 28, 2018).

[2] Cindy Rodriguez, *Reports of Sexual Abuse Against Rikers Inmates Rise*, WNYC News (May 26, 2016) http://www.wnyc.org/story/reports-sexual-abuse-rikers-concern-medical-staff/.

[3] Elizabeth Dwoskin, *Inmate Gets Pregnant in Rikers, Sparking Investigation*, The Village Voice (Apr. 29, 2010) https://www.villagevoice.com/2010/04/29/inmate-gets-pregnant-in-rikers-sparking-investigation/.

[4] Complaint, *Jane Doe 1 v. Santiago*, No. 1:15-cv-03849 (S.D.N.Y. May 19, 2015) (ECF No. 1).

[5] *Id.* ¶¶ 41, 47.

[them] food and the opportunity to shower."[6]  Although one of the inmates finally reported the abuse, by the time the complaint was filed, two years later, she still had not received a written determination of her complaint from the Department of Investigations ("DOI").  The City agreed to settle the lawsuit for $1.2 million.

- In November 2015, a woman filed a federal lawsuit against the DOC asserting that a CO had raped her, after he pushed her down on a bus transporting her and five male inmates to Rikers, while a second correctional officer watched.[7]

- In February 2016, The New York Times reported that a female CO at Rikers was charged with rape after having sexual intercourse with a male inmate.[8]

- In April 2017, the *Daily News* reported on the indictment of a Rikers physician's assistant on forty-three counts of rape, sexual abuse and related crimes committed against four female Rikers inmates.[9]

131.    In 2013, the United States Department of Justice ("DOJ") issued a report, which documented that DOC's RMSC had one of the highest rates among jails of staff-on-inmate sexual misconduct.[10]  Specifically, the DOJ's report found that 5.9% of the inmates were subject to staff-on-inmate sexual misconduct.[11]  In addition, 2.3% of inmates stated that they were

---

[6] *Id.* ¶ 77.

[7] Victoria Bekiempis, *Rikers Island correction officer raped female inmate on bus, invited fellow guard to watch: lawsuit*, Daily News (Nov. 20, 2015) http://www.nydailynews.com/new-york/nyc-crime/rikers-guard-accused-raping-female-inmate-bus-article-1.2442320.

[8] *Charges Against Correction Officer*, NYTimes (Feb. 7, 2016) https://www.nytimes.com/interactive/2016/02/07/nyregion/document-Charges-Against-Correction-Officer.html; Kelly Weill, *Rikers Island Guard Nicole Bartley Busted for Rape, Smuggling Drugs*, Daily Beast (Feb. 8, 2016) http://www.thedailybeast.com/rikers-island-guard-nicole-bartley-busted-for-rape-smuggling-drugs.

[9] Reuven Blau, *Physician's assistant indicted on charges of raping four Rikers Island inmates*, Daily News (Apr. 24, 2017) http://www.nydailynews.com/new-york/nyc-crime/doctor-assistant-charged-raping-rikers-island-inmates-article-1.3095975.

[10] Allen J. Beck, Marcus Berzofsky, Rachel Caspar & Christopher Krebs, Sexual Victimization in Prisons and Jails Reported by Inmates (2011-2012), U.S. DOJ Bureau of Justice Statistics (May 2013) *available at* https://www.bjs.gov/content/pub/pdf/svpjri1112.pdf.

[11] *Id.* at 13.

"physically forced" to engage in sexual activity with a CO, and 5.6% reported that they felt pressured into sexual activity.[12]  These numbers far exceed the nationwide averages.

132.    In August 2014, the United States Attorney for the Southern District issued a letter captioned, "CRIPA Investigation of the New York City Department of Correction Jails on Rikers Island."[13]  Although not the main focus of the investigation, the City's handling of sexual abuse cases continued to be a cause of great concern for the DOJ.

> "Our investigation did not focus on incidents involving alleged sexual assault.  However, the limited information we obtained raises a concern that DOC may be under-reporting sexual assault allegations.  In calendar years 2011 and 2012, DOC reported a total of only seven incidents of alleged sexual assault where the alleged victim was an adolescent.  (Five of these incidents were determined to be unfounded or unsubstantiated and the other two investigations were pending at the time DOC provided the data.)  This number seems extremely small given the size of the adolescent inmate population, the frequency of inmate-on-inmate violence, and the high rate of negative interactions between staff and inmates.  Our consultant expressed concern as to whether allegations of sexual assault are being consistently reported and investigated in compliance with the Prison Rape Elimination Act, 42 U.S.C. § 15601 *et seq.*, and the relevant DOJ implementing regulations.  We encourage the Department to examine these issues."

133.    Disturbingly, the City views sexual abuse of incarcerated persons by staff as inevitable.  At a NYC Board of Correction meeting on June 14, 2016, one of the board members, Gerard Bryant, stated that "[a]s long as we are going to have prisons we are going to have sexual

---

[12] *Id*. at 87.

[13]  The U.S. Attorney's Office for the S.D.N.Y., CRIPA Investigation of the New York City Department of Correction Jails on Rikers Island, 10 n.14 (Aug. 4, 2014) *available at* https://www.justice.gov/sites/default/files/usao-sdny/legacy/2015/03/25/SDNY%20Rikers%20Report.pdf (last accessed on Aug. 28, 2018).

abuse in prisons.  That's the reality.  That's what happens."[14]  He went on to state, "You can tell staff until you're blue in the face, 'Don't have sex with inmates,' and it's still going to happen. OK?"[15]

134.   In September 2014, the City retained the Moss Group, a consulting firm, with funds provided by the U.S. Department of Justice, to review the sexual safety of certain jails at Rikers, including RMSC.  The Moss Group produced a document called the Sexual Safety Assessment Report (the "Moss Report"), which the City did not publicly release, but that was later disclosed to the press.[16]

135.   The Moss Report concluded that fundamental problems existed in the City's handling of sex abuse at Rikers.[17]  According to the Associated Press: "New York City's Rikers Island jail has entrenched problems dealing with sexual abuse, including emergency hotlines that don't work, confidential complaints read by fellow inmates and investigations that don't interview alleged attackers."[18]

---

[14] Nick Malinowski, *NYC Official Says Rape is Inevitable at Rikers Island:  If true, we cannot send anyone there*, HuffPost (June 26, 2016) http://www.huffingtonpost.com/nick-malinowski/nyc-official-says-rape-is_b_10600320.html.

[15] Ezra Kaplan, *New York City Board of Correction proposes rule designed to reduce rape and sexual assault in jails*, AP News (June 15, 2016) https://apnews.com/ba37a82372ee40989d8f63d4dca0f8b2/nyc-board-approves-standards-set-reduce-rape-jails.

[16] Michelle Mark & Associated Press, *Report:  New York's biggest jail has a huge problem with sexual abuse*, Business Insider (Jun. 21, 2016) http://www.businessinsider.com/ap-apnewsbreak-report-assails-nyc-jails-sex-abuse-response-2016-6?r=UK&IR=T.

[17] *Id.*

[18] *Id.*

136.    The City claimed it took the Moss Report seriously.   DOC spokesperson Eve Kessler said that the June 2016 report was a "wake-up call, and we heard it loud and clear."[19] Despite the "wake-up call," the City remains asleep, as correctional staff members continue to rape, sexually abuse, harass, and retaliate against detainees and inmates.

137.    Activists, reformers, and politicians have called for the permanent closing of Rikers.  Governor Andrew Cuomo said:  "This is human, it is real, it is graphic, and it is ugly. The confluence of these evil currents come together in New York City in the East River, in a place called Rikers Island."[20]   Former U.S. Attorney Preet Bharara, who investigated Rikers,[21] said it is a "place where brute force is the first impulse."[22]

138.    On March 31, 2017, Mayor De Blasio said the City plans to close Rikers, but not until at least 2027, even though he has said in the past that Rikers is a "dehumanizing environment," from which inmates are released "more broken than when they came in."[23]

139.    Days after the Mayor's announcement, the Independent Commission on New York City Criminal Justice and Incarceration Reform released a report recommending the closure of Rikers.[24]

---

[19] *Id.*

[20] Will Bredderman, *Cuomo: Lack of 'Political Will' the Only Thing Stopping de Blasio From Closing Rikers Island*, Observer (Mar. 13, 2017) http://observer.com/2017/03/andrew-cuomo-bill-de-blasio-close-rikers-island/.

[21] *See CRIPA Investigation, supra* note 13.

[22] Nick Pinto, *It's Put Up or Shut Up Time for Politicians Who Say They Want to Close Rikers*, The Village Voice (Apr. 4, 2017) http://www.villagevoice.com/2017/04/04/its-put-up-or-shut-up-time-for-politicians-who-say-they-want-to-close-rikers/.

[23] Wendy Joan Biddlecombe, *De Blasio Talks Rikers Island Changes*, Metro (Nov. 20, 2014) http://www.metro.us/new-york/de-blasio-talks-rikers-island-changes/zsJnlb---GjdthK0XSJWMg.

140.    The Chair of the Commission, former Chief Judge of the New York Court of Appeals Jonathan Lippman, said, in conjunction with the release of the report, that Rikers is "a place that is an affront to humanity and decency and is a stain on our city's reputation."[25]

141.    The City's failure to implement the Prison Rape Elimination Act ("PREA"), 42 U.S.C. § 15601 *et seq*., demonstrates its deliberate indifference to the safety and well-being of women in its custody.

142.    The City waited until 2016—thirteen years after the enactment of PREA—to update its sexual safety directive to purportedly implement PREA.[26]

143.    The City, as its own aforementioned reports show, knows that COs and other correctional staff subject women at RMSC to recurrent and ongoing acts of rape, oral sexual acts, sexual touching, public masturbation, voyeurism, demeaning sexual comments, and physical and verbal intimidation to deter women in custody from reporting such sexual abuse.

144.    The City, moreover, assigns male COs to guard women, often alone, without adequate safeguards to prevent rape and other sexual abuse.  Male COs are assigned to posts in which they have unmonitored contact and complete discretion and control over incarcerated women.  Upon information and belief, a single male CO, for example, is often assigned to dormitory areas during nighttime hours.

---

[24] A More Just New York City, The Independent Commission on New York City Criminal Justice and Incarceration Reform, http://www.morejustnyc.org/#home-1 (last accessed Aug. 28, 2018).

[25] Pinto, *supra* note 22.

[26] *See* Directive, DOC, Classification 5011 Elimination of Sexual Abuse and Sexual Harassment (effective May 2, 2016).

145.    COs who rape, sexually abuse, and sexually harass incarcerated women routinely leave their assigned posts and take women into areas where prisoners are not permitted or at times when the women should be locked in their cells.

146.    COs provide certain women with contraband items, including drugs (which COs smuggle into the jail).[27]  The City has failed to take action despite knowledge of this misconduct and has not enforced policies intended to identify, address, and prohibit sexual abuse of inmates by COs.

147.    The City permits COs virtually unfettered access to areas such as kitchen store rooms, storage closets, and pantries where they can rape, sexually abuse, and sexually harass women with minimal risk of detection.

148.    The City has failed to employ obvious measures to reduce the risk of rape, sexual abuse, and sexual harassment of incarcerated women by COs, such as heightened monitoring of behavior indicative of ongoing sexual abuse, appropriately placed and functional surveillance cameras installed and maintained without staff knowledge, exit interviews of incarcerated women upon transfer or release, random interviews of staff, and more frequent, unannounced rounds by supervisory officials.

149.    The City's system for the reporting and investigation of rape, sexual abuse, and sexual harassment is grossly inadequate, and the City fails to take appropriate action to protect those who do manage to come forward or to punish their abusers.

---

[27] For example, DOI reported that Probationary CO Torray Riles was arrested on January 21, 2018, and charged with Promoting Prison Contraband in the Second Degree, a Class A misdemeanor; Riles had smuggled in about 26 grams of marijuana, which he had concealed in his underwear.  *See* DOI Report, *DOI Investigation Leads to Arrest of City Correction Officer on Contraband Charges,* 14 (Jan. 23, 2018) *available at* https://www1.nyc.gov/assets/doi/press-releases/2018/jan/03Riles_012318.pdf.

**CAUSES OF ACTION**

**COUNT I  (JANE DOE'S DUE PROCESS CLAIM AGAINST COSME)**

150.    Jane Doe repeats and re-alleges each of the allegations contained in paragraphs 1 through 149 with the same force and effect as if fully set forth herein.

151.    At all relevant times, Cosme was acting in his capacity as a CO employed by the City.

152.    At all relevant times, Cosme was acting under color of state law.

153.    Cosme raped, sexually abused, and sexually harassed Jane Doe by coercing, threatening, and using physical force to compel her to perform sexual acts, including intercourse, as detailed herein.

154.    As a result of the rape, sexual abuse, and sexual harassment, Jane Doe suffered severe physical harm and suffered and continues to suffer psychological and emotional distress, including PTSD.  Jane Doe continues to experience depression and anxiety, has difficulty sleeping, and has had flashbacks of Cosme's rape, sexual abuse, and sexual harassment.

155.    By virtue of Cosme's rape, sexual abuse, and sexual harassment of Jane Doe, Cosme deprived her of her due process rights under the Fourteenth Amendment to the United States Constitution.

**COUNT II  (JANE DOE'S CLAIM AGAINST COSME FOR RETALIATION)**

156.    Jane Doe repeats and re-alleges each of the allegations contained in paragraphs 1 through 149 with the same force and effect as if fully set forth herein.

157.    Cosme retaliated against Jane Doe for reporting his rape, sexual abuse, and sexual harassment.

158.   As a result of Cosme's retaliation, Jane Doe suffered severe physical, psychological and emotional distress, including PTSD.  She continues to experience depression and anxiety, has difficulty sleeping and has had flashbacks of the rapes and sexual abuse.

159.   By virtue of his retaliation against Jane Doe for her reports of his sexual abuse, Cosme deprived her of her right to the freedom of speech in violation of her rights under the First and Fourteenth Amendments to the United States Constitution.

### COUNT III  (JANE DOE'S DUE PROCESS CLAIM AGAINST McNEIL)

160.   Jane Doe repeats and re-alleges each of the allegations contained in paragraphs 1 through 149 with the same force and effect as if fully set forth herein.

161.   At all relevant times, McNeil was acting in his capacity as a CO employed by the City.

162.   At all relevant times, McNeil was acting under color of state law.

163.   McNeil raped, sexually abused, and sexually harassed Jane Doe by manipulating and coercing her to perform sexual acts, including oral sex and vaginal intercourse, as detailed herein, when, as a detainee at Rikers, she could not consent to sexual activity.

164.   As a result of McNeil's rape, sexual abuse, and sexual harassment, Jane Doe suffered and continues to suffer psychological and emotional distress.  Jane Doe continues to experience depression and anxiety and has difficulty sleeping.

165.   By virtue of McNeil's rape, sexual abuse, and sexual harassment of Jane Doe, McNeil deprived her of her due process rights under the Fourteenth Amendment to the United States Constitution.

**COUNT IV (JANE DOE'S CLAIM AGAINST McNEIL FOR AIDING AND ABETTING RAPE)**

166.    Jane Doe repeats and re-alleges each of the allegations contained in paragraphs 1 through 149 with the same force and effect as if fully set forth herein.

167.    McNeil aided and abetted Cosme's rape, sexual assault, and sexual harassment of Jane Doe.

168.    McNeil knew that Cosme intended to rape and sexually assault Jane Doe. McNeil provided substantial assistance to Cosme by bringing Jane Doe near Cosme's office in an abandoned area of RMSC and then leaving her unattended so that Cosme could order Jane Doe to go to his office alone.

169.    If McNeil had not left Jane Doe alone, Cosme would not have been able to rape Jane Doe; thus, McNeil's actions were a significant factor in causing harm to Jane Doe.

170.    While Cosme was raping Jane Doe, McNeil did nothing to stop the rape and instead returned to his office without Jane Doe, even though he knew that because she was a detainee, Jane Doe could not return to her cell without being escorted by a CO.

**COUNT V  (JANE DOE'S CLAIM AGAINST McNEIL FOR RETALIATION)**

171.    Jane Doe repeats and re-alleges each of the allegations contained in paragraphs 1 through 149 with the same force and effect as if fully set forth herein.

172.    McNeil retaliated against Jane Doe after she reported that Cosme raped, sexually assaulted, and sexually harassed her.

173.    As a result of the retaliation, Jane Doe suffered severe physical, psychological, and emotional distress, including PTSD.  Jane Doe continues to experience depression and anxiety and has difficulty sleeping.

174.    By virtue of McNeil's retaliation against Jane Doe, McNeil deprived her of her right to the freedom of speech in violation of her rights under the First and Fourteenth Amendments to the United States Constitution.

**COUNT VI  (JANE DOE'S DUE PROCESS CLAIM AGAINST THE CITY)**

175.    Jane Doe repeats and re-alleges each of the allegations contained in paragraphs 1 through 149 with the same force and effect as if fully set forth herein.

176.    The foregoing actions and inactions of the City of New York constitute a policy, pattern, practice or custom which amounts to deliberate indifference to the constitutionally protected safety and liberty interests of Jane Doe.

177.    As a result of The City's policies, practices, actions and inactions, the City has caused Jane Doe to be subjected to rape, sexual abuse, and sexual harassment, while she has been detained in the City's custody in violation of her due process rights under the Fourteenth Amendment to the United States Constitution.

**COUNT VII  (JANE DOE'S CLAIM AGAINST THE CITY FOR RETALIATION)**

178.    Jane Doe repeats and re-alleges each of the allegations contained in paragraphs 1 through 149 with the same force and effect as if fully set forth herein.

179.    The foregoing actions and inactions of the City of New York constitute a policy, pattern, practice or custom which amounts to deliberate indifference to the constitutionally protected safety and liberty interests of Jane Doe.

180.    The City, through its policies, practices, action and inaction, caused Jane Doe to be subjected to retaliation for reporting rape, sexual abuse, and sexual harassment, in violation of her rights under the First and Fourteenth Amendments to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A. An order entering judgment for her against Defendants on each of her claims for relief;

B. An award to her for compensatory damages against all Defendants, jointly and severally, for their violation of her First and Fourteenth Amendment rights, the amount to be determined at trial;

C. An award to her of punitive damages against Cosme on the basis of his conscious, criminal wrongdoing and callous indifference to her constitutional rights and welfare, the amount to be determined at trial;

D. An award to her of punitive damages against McNeil on the basis of his conscious, criminal wrongdoing and callous indifference to her constitutional rights and welfare, the amount to be determined at trial;

E. An award to her of the costs of this action, including reasonable attorneys' fees;

F. Preclusion of Cosme from serving in the capacity of correctional officer;

G. Preclusion of McNeil from serving in the capacity of correctional officer; and;

H. Such other and further relief as may be just and proper.

August 29, 2018

THE LEGAL AID SOCIETY

By: _____

William D. Gibney
    wdgibney@legal-aid.org
Marlen S. Bodden
    mbodden@legal-aid.org
Barbara P. Hamilton
    bphamilton@legal-aid.org
199 Water Street
New York, NY 10038
(212) 577-3287


CRAVATH, SWAINE & MOORE LLP,

by _____

Antony L. Ryan
Brittany L. Sukiennik
Molly M. Jamison

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
    aryan@cravath.com
    bsukiennik@cravath.com
    mjamison@cravath.com

*Attorneys for Plaintiff Jane Doe*